UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____
                              :
LENNY ROSS,                   :
                              :   Civ. No. 19-6595 (NLH)
          Petitioner,         :
                              :
     v.                       :
                              :
PATRICK NOGAN, et al.,        :   OPINION
                              :
          Respondents.        :
_____:

Appearances

Lenny Ross
873781
East Jersey State Prison
Lock Bag R
Rahway, NJ 07065

     Petitioner pro se

John J. Santoliquido, Esq.
Office of the Prosecutor
4997 Unami Blvd.
P.O. Box 2002
Mays Landing, NJ 08330

     Counsel for Respondents

HILLMAN, District Judge

     I.   INTRODUCTION

     Petitioner is a state prisoner proceeding pro se with a

petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

For the following reasons, Petitioner's habeas petition will be

denied and a certificate of appealability will not issue.

II.  FACTUAL AND PROCEDURAL BACKGROUND

Petitioner shot and killed Steven Gurss on December 24, 2011, during a drug transaction when Gurss did not pay for the drugs Petitioner supplied him.  See ECF No. 5-4 at 7.  At the time of the shooting, Shawn Rice, a neighbor of Petitioner's, stated he heard gun shots and a car crash.  See ECF No. 5-3 at 14.  Rice then looked out the window and recognized Petitioner. See id. at 14-15.  Investigators later showed Rice Petitioner's photograph and he positively identified Petitioner as the person he saw.  See id. at 19.  Another witness, Krystal Stanford, also positively identified that Petitioner was at the crime scene. See id. at 26-27.  Like Rice, Stanford also identified Petitioner from a photograph of him shown to her.  See id. at 29-30.

On November 27, 2012, Petitioner was indicted on multiple counts by an Atlantic County, New Jersey grand jury.  See ECF No. 5-2.  More specifically, the grand jury charged Petitioner as follows:

1. Three counts of possession of heroin in violation of N.J. Stat. Ann. § 2C:35-10a(1) (Counts 1, 9 and 11)

2. Two counts of possession of heroin with intent to distribute in violation of N.J. Stat. Ann. § 2C:35-5a(a) (Counts 2 and 12)

3. One count of possession of a firearm while possessing heroin with intent to distribute in violation of N.J. Stat. Ann. § 2C:39-4.1 (Count 3)

4. One count of murder in violation of N.J. Stat. Ann. §
   2C:11-3a(1)(2) (Count 4)

5. One count of possession of a firearm for an unlawful
   purpose in violation of N.J. Stat. Ann. § 2C:39-4a (Count
   5)

6. One count of unlawful possession of a handgun in violation
   of N.J. Stat. Ann. § 2C:39-5b (Count 6)

7. One count of distribution of heroin in violation of N.J.
   Stat. Ann. §§ 2C:35-5a(1) & 2C:35-5b(3) (Count 10)

8. One count of possession of a handgun by a convicted person
   in violation of N.J. Stat. Ann. § 2C:39-7 (Count 13)[1]

Petitioner unsuccessfully moved to suppress Rice and

Stanford's identifications.  See ECF No. 5-3 at 129.

Subsequently, the matter was prepared for trial to begin in

January 2014.  After jury selection though, Petitioner pled

guilty to one amended count of aggravated manslaughter.  The

other counts were dismissed.  See ECF No. 5-4 at 2.  During the

plea hearing, Petitioner admitted he shot Gurss one time after

Gurss tried to "rip [him] off" for the drugs.  See id. at 7.

Petitioner next moved to withdraw his guilty plea before

sentencing.  In support of his motion to withdraw his plea,

Petitioner noted "the questionable nature of his identification

by supposed eyewitnesses and the fact that the alleged weapon

used was found several months after the incident, evidently,

---

[1] Co-defendant Teonka Williams was charged in Counts 7 and 8 and
co-defendant Nicolas Chickadel was charged along with Petitioner
in Count 9.

with no prints or no DNA on it[,]" and that the prosecutor
withheld photographs from discovery.  <u>See</u> ECF 5-5 at 3.
Petitioner also argued that the State provided new evidence on
the eve of trial such that he only had five or ten minutes to
decide on whether to plead guilty after receipt of this
evidence.  <u>See</u> <u>id.</u> at 3-4.

The New Jersey Superior Court denied Petitioner's motion to
withdraw his guilty plea finding that Petitioner knowingly and
voluntarily entered his plea and nothing in his motion to
withdraw gave him the right to do so.  <u>See</u> <u>id.</u> at 8.  Petitioner
then received a sentence of thirty years imprisonment.  <u>See</u> <u>id.</u>
at 17.

Petitioner appealed to the New Jersey Superior Court,
Appellate Division arguing he received an excessive sentence.
<u>See</u> ECF No. 5-6 at 4-5.  Petitioner's appeal was placed on the
Appellate Division's Excessive Sentencing Oral Argument ("ESOA")
calendar which only allows a party to raise claims related to
the excessiveness of a sentence pursuant to N.J. Ct. R. 2:9-11.[2]

---

[2] That rule states as follows:

> In a criminal, quasi-criminal or juvenile
> action in the Appellate Division in which
> the only issue on appeal is whether the
> court imposed a proper sentence, briefs
> shall not be filed without leave of court
> and the matter shall be placed on a
> sentencing calendar for consideration by the
> court following oral argument, which shall

Petitioner then filed a pro se appellate motion that the
Superior Court should have allowed him to withdraw his guilty
plea and requested that his appeal be placed on the Appellate
Division's plenary calendar.  See ECF No. 5-18 at 90-95.
Petitioner's appellate counsel also made this argument on
Petitioner's behalf during oral argument before the ESOA
Appellate Division calendar.   See ECF No. 5-6 at 5.

The appeal though was not reassigned to the plenary
calendar.  Instead, on October 1, 2014, the same day as the
Appellate Division heard oral argument on Petitioner's appeal on
its ESOA calendar, the Appellate Division issued a one-page
order holding that the only issue on appeal related to
Petitioner's sentence and that the sentence was not manifestly
excessive or unduly punitive.  See ECF No. 5-10.

Petitioner then filed a petition for certification to the
New Jersey Supreme Court.  See ECF Nos. 5-11 & 5-12.  Among the
claims Petitioner raised to the New Jersey Supreme Court were
that:  (1) the Appellate Division denied his right to direct
appeal because the matter was placed on the Appellate Division's

---

be recorded verbatim. The appellate court at
its discretion may direct the removal of any
case from the sentencing calendar.

N.J. Ct. R. 2:9-11. The ESOA was an outgrowth of a pilot
program.  The New Jersey Supreme Court has found it does not
violate a defendant's due process rights.  See State v. Bianco,
511 A.2d 600, 608 (N.J. 1986).

ESOA rather than its plenary calendar; and (2) the Superior Court improperly denied his constitutional right to a trial when it denied his motion to withdraw his guilty plea.  See ECF No. 5-12.  On October 22, 2015, the New Jersey Supreme Court denied certification without discussion.  See ECF No. 5-14.

Thereafter, Petitioner filed a post-conviction relief ("PCR") petition in the Superior Court.  See ECF Nos. 5-15, 5-16, 5-18.  Petitioner raised several ineffective assistance of counsel claims in his PCR petition.  The Superior Court held oral argument on Petitioner's PCR petition on April 6, 2017.  See ECF 15-7.  On May 2, 2017, the Superior Court denied Petitioner's PCR petition in a written opinion and order.  See ECF Nos. 5-19 & 5-20.  The Appellate Division affirmed the denial of Petitioner's PCR petition on appeal.  See ECF 5-24.  The New Jersey Supreme Court denied Petitioner's petition for certification on his PCR petition without discussion.  See ECF No. 5-25.

Petitioner then filed his federal habeas petition in this Court.  See ECF No. 1.  Petitioner raises seven claims in his habeas petition, they are as follows:

1. Petitioner was denied the right to a direct appeal when the Appellate Division failed to consider his claim that the Superior Court erred in denying his motion to withdraw his guilty plea ("Claim I").

2. Petitioner was denied his right to a trial when the Superior Court denied his motion to withdraw his guilty plea ("Claim II").

3. Trial counsel was ineffective due to his lack of diligence in failing to follow Petitioner's request for discovery, suppression motions, an interlocutory appeal on the denial of his suppression motions, getting a 10-15 sentence and filing a motion to withdraw his guilty plea ("Claim III").

4. Trial counsel was ineffective by failing to investigate and present a trial strategy by not challenging the credibility of Rice and Stanford's identifications ("Claim IV").

5. Trial counsel was ineffective by failing to present a viable defense and exculpatory evidence by not obtaining an affidavit from Rice nor Petitioner to support Petitioner's actual innocence argument on his motion to withdraw his guilty plea ("Claim V").

6. Counsel was ineffective on appeal for failing to raise an argument that the Superior Court erred in denying his motion to withdraw his guilty plea ("Claim VI").

7. PCR counsel was ineffective in failing to investigate and interview witnesses Rice and Aaron Chandler ("Claim VII").

Respondents filed a response in opposition to Petitioner's habeas petition.  See ECF Nos. 5 & 6.  Petitioner did not file a reply brief.

III. LEGAL STANDARD

An application for writ of habeas corpus by a person in custody under judgment of a state court can only be granted for violations of the Constitution or laws or treaties of the United States.  See Engle v. Isaac, 456 U.S. 107, 119 (1982); see also, Mason v. Myers, 208 F.3d 414, 415 n.1 (3d Cir. 2000) (citing 28 U.S.C. § 2254).  Petitioner filed this petition for writ of

habeas corpus after April 24, 1996, thus, the Antiterrorism and
Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132,
110 Stat. 1214 (Apr. 24, 1996), applies.  See Lindh v. Murphy,
521 U.S. 320, 326 (1997).  Under AEDPA, federal habeas corpus
relief is not available for any claim decided on the merits in
state court proceedings unless the state court's adjudication of
the claim:  (1) resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established
federal law, as determined by the Supreme Court of the United
States; or (2) resulted in a decision that was based on an
unreasonable determination of the facts in light of the evidence
presented in state court.  See 28 U.S.C. § 2254(d).

     As a threshold matter, a court must "first decide what
constitutes 'clearly established Federal law, as determined by
the Supreme Court of the United States.'"  Lockyer v. Andrade,
538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).
"'[C]learly established federal law' under § 2254(d)(1) is the
governing legal principle set forth by the Supreme Court at the
time the state court renders its decision."  Id. (citations
omitted).  A federal habeas court making an unreasonable
application inquiry should ask whether the state court's
application of clearly established federal law was "objectively
unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409
(2000).  Thus, "a federal court may not issue a writ simply

because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411. Furthermore, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence.  See 28 U.S.C. § 2254(e); see also Rice v. Collins, 546 U.S. 333, 339 (2006) (petitioner bears the burden of rebutting presumption by clear and convincing evidence); Duncan v. Morton, 256 F.3d 189, 196 (3d Cir. 2001) (factual determinations of state trial and appellate courts are presumed to be correct).

The AEDPA standard under § 2254(d) is a "difficult" test to meet and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).  A petitioner carries the burden of proof and with respect to review under § 2254(d)(1), that review "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 563 U.S. at 181.

In applying AEDPA's standards, the relevant state court decision that is appropriate for federal habeas corpus review is the last reasoned state court decision.  See Bond v. Beard, 539 F.3d 256, 289-90 (3d Cir. 2008).  Furthermore, "[w]here there

has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); see also Dennis Sec'y Dep't of Corr., 834 F.3d 263, 353 n.10 (3d Cir. 2016) (Jordan, J., concurring in part and concurring in the judgment) (noting that while Ylst predates the passage of AEDPA, the Ylst presumption that any subsequent unexplained orders upholding the judgment will be presumed to rest upon the same ground is still valid).

Additionally, AEDPA deference is not excused when state courts issue summary rulings on claims as "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington v. Richter, 562 U.S. 86, 99 (2011) (citing Harris v. Reed, 489 U.S. 255, 265 (1989)).

Where a Petitioner has failed to exhaust a claim in the state courts, a federal habeas court can still deny that claim on the merits provided it is not "colorable." See Carpenter v. Vaughn, 296 F.3d 138, 146 (3d Cir. 2002) (quoting Lambert v. Blackwell, 134 F.3d 506, 514–15 (3d Cir. 1997) (construing 28 U.S.C. § 2254(b)(2))); see also 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the

merits, notwithstanding the failure of the applicant to exhaust
the remedies available in the courts of the State.").

IV.  DISCUSSION

A. Claims I & II

Petitioner asserts in Claim I that his right to directly
appeal the Superior Court's denial of his motion to withdraw his
guilty plea was unconstitutionally denied because his appeal was
assigned and remained with the ESOA Appellate Division panel.
In Claim II, Petitioner makes the more direct claim that the
Superior Court's denial of his motion to withdraw his guilty
plea was unconstitutional.

Petitioner takes exception to the legitimacy of the ESOA
calendar as it prevented him from raising claims outside of the
sentencing context, most notably issues related to the denial of
his motion to withdraw his guilty plea.  Respondents attached
Petitioner's notice of appeal as well as his pro se request to
have his appeal moved from the ESOA calendar to the Appellate
Division's plenary calendar.  See ECF Nos. 8 & 5-18 at 90-95.
Petitioner expressly stated he wished to appeal the denial of
his motion to withdraw his guilty plea by the Superior Court on
direct appeal.  See ECF No. 5-18 at 94-95; ECF No. 5-6 at 4-5.

The Appellate Division affirmed Petitioner's sentence in a
one-page order the same day it held oral argument.  The entirety
of that order stated as follows:

11

> Having considered the record and argument of counsel, and it appearing that the issues on appeal relate solely to the sentence imposed, we are satisfied that the disposition is not manifestly excessive or unduly punitive and does not constitute an abuse of discretion.  State v. Bieniek, 200 N.J. 601 (2010); State v. Natale, 184 N.J. 458 (2005); State v. O'Donnell, 117 210 (1989); State v. Ghertler, 114 N.J. 383 (1989); State v. Roth, 95 N.J. 334 (1984).

> The judgment of the trial court is affirmed.

ECF No. 5-10.  Thus, the Appellate Division did not expressly rule on Petitioner's claim that the Superior Court erred in denying his motion to withdraw his guilty plea given that it stated Petitioner's only claim related to his sentence.

Petitioner though argued to the New Jersey Supreme Court that the Appellate Division erred by not converting his appeal to the plenary calendar so it could also consider his separate argument that his motion to withdraw his guilty plea was improperly denied.  See ECF No. 5-12.  The New Jersey Supreme Court summarily denied Petitioner's petition for certification without discussion.  See ECF No. 5-14.

For purposes of this opinion, this Court will analyze Claim II, before analyzing Claim I.  Based on the foregoing procedural history, the last reasoned decision as it relates to Claim II – whether the Superior Court erred in denying Petitioner's motion to withdraw his guilty plea - is from the Superior Court.  That Court ruled on Petitioner's motion from the bench as follows:

[B]oth parties briefed this matter under
Slater.  And under Slater, before the
sentence the – Slater, is 198 N.J. 145,
dealing with the issue of withdrawing a
guilty plea.  It should be noted that the
defendant entered a guilty plea after a jury
was selected, and it was right before
openings were to take place, the day after
jury selection, where he pled to an
aggravated manslaughter charge for a penalty
with a cap of 30 years State Prison.

Under Slater there's four factors that the
Court has to consider.  First, whether
defendant has in fact, asserted a colorable
claim of innocence.  Two, whether or not the
strength of defendant's reasons for
withdrawal consider the strength of those
reasons.  Three, whether in fact, there was
a plea bargain, which there was in this
case.  And some facts to consider is that
defendants would normally have a heavier
burden in seeking to withdraw pleas entered
as a part of a plea bargain.

Fourth, the Court should consider whether
withdrawal would result in unfair prejudice
to the State or unfair advantage to the
accused.  And they say the Court should look
at the particulars of each case, loss or
inability to find or locate, get witnesses
back, witnesses' memories faded on a
contested point, whether there's any loss of
evidence and things of that nature.  And
also what should obviously come under there
would be pretrial preparation, not only by
the Court, but the State, and whether or not
that would involve getting witnesses in and
out of court and things of that nature.

Defendant, through their brief – through his
brief alleges that he has met the Slater
factors, and he alleges that he should be
allowed to withdraw his guilty plea because
he didn't commit the offense to which he
pled guilty.  And he questions the
questionable nature of his identification by

13

supposed eyewitnesses and the fact that the
alleged weapon used was found several months
after the incident, evidently, with no
prints or no DNA on it.

He also indicates the prosecutor withheld
evidence 'til the day before opening a photo
of some guns and a photo where they tried to
match the shell casings to the Glock 19,
which match was inconclusive.  And he also
alleges a mock – I'm sorry – a model Glock
19 was found on 4/13/12, four months after
the homicide, and the DNA flag was negative.
So, he alleges it was not his weapon, and no
print was on it.

He also alleges that on the night of the
homicide, 12/24/11, the State's witnesses
who called 9-1-1 told the dispatcher they
didn't see anyone in the area or fleeing the
scene. He alleges that Shawn Rice (phonetic)
lied to the investigating officer about his
name, and that he and his girlfriend wished
to remain unknown.  And he indicates
witnesses signed off on defendant and co-
defendant's mug shots, but in a tape
recorded statement said they did not see
their faces.

He also indicates that the crime was some 57
feet away from the witnesses' living room,
and happened in the evening.  Both witnesses
claim that the suspects had on hoodie
sweatshirts.

The State counters some of that by
indicating that it's important to note that
neither Rice nor Stanford (phonetic), who
gave statements, ever actually observed the
shooting.  And they simply identified the
defendants as their neighbor, somebody they
knew from the neighborhood.  And that this
truck that the victim was in was seen in
that neighborhood previously with Mr. Ross,
and that they had seen both of them together
evidently doing drug buys because evidently

14

that's what was going on at the time of this
incident.

The – and also defense alleges the State's
failure to bring in new evidence until the eve
of trial before the opening was a
violation of his rights under the 5th and 14th
Amendment, and that the Court should have
dismissed the case or granted a mistrial –
which mistrial motion was never sought by
the way – should have been declared due to
prosecutorial misconduct.

And he indicates that he had no more than
five or ten minutes to make a decision to
plead guilty.  That's absolutely not true.
The jury in this case was picked all day on
like a Monday, and then overnight we
recessed, and then we were coming in the
next day to do openings.  And right before
openings Mr. Wilson came to me with Ms.
Gravitz and indicated – Mr. Wilson indicated
he had been speaking with the defendant and
they wished to change his plea and enter
into a plea that would basically be an
aggravated manslaughter plea, and that the
murder charge of which he was charged would
be amended to aggravated manslaughter with a
cap of 30 years.

So, I don't know where he gets the fact that
he only had five or ten minutes.  He sat
through jury selection, partook in jury
selection.  That was the whole day.  Mr.
Wilson was here that whole day.  We
adjourned for that day.  Mr. Wilson came
back, and then we were ready to pick – ready
to open when he decided that he wanted to
plea.  Nobody put any pressure on him from
the court or anywhere else about a plea,
that's for sure.

The State says defendant has not provided
any type of certification or affidavit as
they're supposed to.  They would indicate
some type of plausible basis or colorable
claim of innocence, and that his claims that

he makes in the form of his lawyer's brief
is a bare assertion of innocence.  And he
has not presented a colorable claim in
affidavit form with any information that
could be checked out as to his innocence.

He also – the State also indicates that his
argument regarding these pictures is a red
herring in that the pictures were obtained
early on in the investigation – and I think
Mr. Wilson will acquiesce to this – and they
were turned over to the defense in a disk a
year prior.  And as a result of a search
warrant being issued to the co-defendant,
Tanika Williams' (phonetic) cell phone and
defendant, they were provided with this
disk.

And that what the prosecutor gave to Mr.
Wilson in anticipation having marked for
trial was basically a blowup of those
photographs that appeared on the disk.  And
I don't think Mr. Wilson disputes that.  And
therefore an argument that he didn't have
that or it wasn't supplied or it was
supplied at the eleventh hour is totally
without merit because he – his assertion
that he was baffled by this, under heavy
stress at the time of the plea is actually
belied by the Court.  The Court has the
transcript of his guilty plea.

Furthermore, he entered into what I consider
to be a favorable, lenient plea – which I'll
go into the reason in a moment – a
favorable, lenient plea of what he was
looking at.  Furthermore, it's been two
years since the crime.  The State spent a
lot of money preparing the case for trial,
and the victim's family was heavily involved
in the case.

In fact, the record should reflect that I
refused, based on the defendant's
constitutional right to a speedy trial, I
refused to put the case off more than a few
weeks to allow the defense – victim's family

to come up here after they were going to be
in Florida for a long period of time.  And I
refused to put the case off two months for
them to come back from Florida.

I basically said, much to the chagrin of the
prosecutor, that I while I can understand
the victim wanting to be here, while I can
understand the victim's emotional attachment
to the case, that the defendant was
asserting a right to go to trial, speedy
trial, wanted to go to trial, was ready to
go to trial, and I scheduled the case right
after the Christmas holiday, and scheduled
it the first week of January.

As a result of that, the victim's family, at
great expense, left the State of Florida,
flew up to New Jersey for the trial.  And in
fact, my memory is absolutely completely
clear that the day of the plea they were on
their way up here, and the prosecutor wanted
to hold off on finalizing the plea for an
hour or two until they landed in Atlantic
City and got here to the courthouse because
they were coming up here to stay for the
trial, that they were that much invested in
it.

So, I pushed the case to January.  The
request, I believe, was to put the case off
'til March, which I denied the State's
request in that regard because the defendant
was entitled to what he wanted, which was a
speedy trial, and he was going to get a
speedy trial.  We picked a jury, we were
ready to have openings when he decided on
his own to enter into a negotiated open-type
plea with a cap attached to the top.

In any event, it would appear under the
Slater criteria that his claim of innocence
is a bald assertion if anything.  It would
appear there would be prejudice to the State
if the motion is granted.  The State had a
huge witness list.  I don't remember how
many people, but it was over 20 people that

17

were subpoenaed.  They were interviewed,
they were subpoenaed to be in court.

As I said, the victim's family went through
great expense to fly up here from Florida
for the trial.  And the issue about not
seeing these pictures is absolutely not
true.  They were all on a disk.  They were
simply blown up for the time of trial.  So,
that argument is really one that is
completely without merit.

Finally, there was a plea bargain entered
into.  It was a negotiated plea, and it was
entered into freely and voluntarily.  And it
was entered into on January 7, 2014 before
this Court.  Defendant, as a part of that
transcript, was asked things like, and you
were here yesterday, the whole day, and you
participated in jury selection?  He answered
yes.  And you understand the jury is in the
next room, they were right there in the next
room and are ready to commence this trial?
Yes.  And you discussed all that with your
lawyer?  Yes.

And then he initialed and went over all the
forms, that he was 31 years old.  He also
indicated – in the beginning of the colloquy
I went over the terms of the plea, that the
sentence was in the Court's discretion with
a max of 30 years.  And – and when I say
lenient, favorable plea, the State took off
the table the fact that he was extended-term
eligible.

Extended-term eligible on a murder case
means that if convicted, he would have been
looking at a potential sentence of life in
prison; that's 75 years.  He entered into a
plea for a max, cap of 30 years.  So, the
State taking off the possibility of an
extended term, in my view, was rather huge.

I asked him on Page 3 if anybody forced him
or threatened him to enter into the plea, if
he was under the influence of any kind of

drug, if he understood that he had the right
to continue the trial we started yesterday
and put the State to their proofs, whether
he understood the State had to prove all the
charges beyond a reasonable doubt.  He had
the right to cross examine witnesses and
testify if he wanted to, but he wouldn't
have to, and if he didn't, nobody could say
anything negatively about that to the jury,
of which he answered yes to all of those
questions.

He then went on to indicate at Page 5 he
understood that this was an open plea to
aggravated manslaughter, which means his
sentence could be, in discretion of the
Court, would be between 10 and 30 years in
New Jersey State Prison under the No Early
Release Act.  He understood that.

Then I asked him, do you understand what the
No Early Release Act is, he said, yes.  And
I said, it means you have to serve a certain
percentage, what is that percentage, and
correctly and quickly he answered yes, 85
percent, at Page 6 of the transcript.  I
also explained to him about the parole
supervision after the sentence, and he
answered those questions appropriately.

He said he discussed all of that with his
lawyer.  I asked him then if he recklessly
caused the death of Steven Gerse (phonetic),
yes.  And then he went on to say that Mr.
Gerse text him, asked me to buy some drugs.
I told him he could.  He came to the spot,
where he came to the spot he tried to rip me
off for the drugs.  He jumped in his truck,
and he tried to ride off, and I fired a
single shot.

And he said he had a Glock 19, and he said
he shot as he was driving away.  And he also
said, when we usually had hand transactions
– he's saying he's had numerous prior drug
transactions with the victim – I pass him
the drugs, and he passes me the money.  He

passed me the money, and he said police, and
he hurried up, and when he sped off in his
truck he almost ran me over.

And he was – said he was expecting $225 that
he didn't get.  He was supposed to hand me
money, instead, he sped off.  His truck
almost ran me over.  And I said, you admit
that firing the shot then was reckless?
Yes.  And it was without regard for the
value of human life knowing that what could
happen, that he could get killed, and he
said, yes.  And he indicated he fired a
single shot, and that the victim was hit.

He had the advice of competent counsel.  We
took all day almost to pick a jury.  He
participated in the jury selection.  He
decided with his lawyer to have discussions
with the prosecutor overnight, the next
morning, whatever.  I was here with jurors
ready to walk into the room when I was told
that he wanted to enter into an open plea
with a cap of 30, and the Court took the
plea.

Nothing that he indicates in his moving
papers under Slater factors in my view would
come close to a colorable claim of a
defense.  It was a part of a plea bargain.
The State went through much expense and time
to get the witnesses.  Not to say the time
and the resources the Court took to bring in
– it was about 95 to 100 jurors that day,
and have the Court go through a very tedious
jury selection process that the – the way
that we have to pick juries now, tedious is
probably the nicest word of that process
that I could come up with.  And all those
things happened.

Mr. Ross, that was no dress rehearsal, that
was the real thing. We were ready to try
your case.  You knowingly, voluntarily, with
the advice of competent counsel chose to
switch gears and enter into a guilty plea.
If you were buying a car, I would call it

> buyer's remorse.  That maybe you thought
> after you bought the car, I can't afford it.
> Well, you entered into that plea knowingly,
> voluntarily, and nothing you have said in
> your moving papers, in my view, would give
> you the right to withdraw that plea, and
> therefore your motion is denied.

ECF No. 5-5 at 2-8.

Petitioner argues that he was denied his constitutional right to trial when the trial court denied his motion to withdraw his guilty plea.  See ECF No. 1 at 26.  In essence, Petitioner asserts in Claim II the trial court misapplied the factors laid out by the New Jersey Supreme Court in State v. Slater, 966 A.2d 461 (N.J. 2009); namely:

1) whether he asserted a colorable claim of innocence;

2) the nature and strength of his reasons for withdrawal;

3) the existence of a plea bargain; and

4) whether the withdrawal would result in unfair prejudice to the state or unfair advantage to him.

Id. at 468.

To the extent that Petitioner is basing Claim II due to the trial court's purported error of state law, it is not cognizable in this § 2254 action.  See Estelle, 502 U.S. at 67. Additionally, as courts have noted, '"[t]here is no Federal or Constitutional right to withdraw a guilty plea.'"  Bishop v. New Jersey, No. 16-9178, 2018 WL 4198884, at 13 (D.N.J. Aug. 31, 2018) (quoting Roten v. Deloy, 575 F. Supp. 2d 597, 605 n.3 (D.

Del. 2008) (citing <u>Hines v. Miller</u>, 318 F.3d 157, 162 (2d Cir. 2003); <u>Gov't of Virgin Islands v. Berry</u>, 631 F.2d 214, 219 (3d Cir. 1980))).  "A plea of guilty is a waiver of trial resulting in a conclusive conviction and does not deny the defendant a right to a jury trial."  <u>See</u> <u>id.</u> (citing <u>United States v. Colonna</u>, 142 F.2d 210, 213 (3d Cir. 1944)).

The constitutional and cognizable element within Claim II though is whether Petitioner's plea was voluntary and intelligent.  <u>See</u> <u>North Carolina v. Alford</u>, 400 U.S. 25, 31 (1970) (citations omitted).  The voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it."  <u>Brady v. United States</u>, 397 U.S. 742, 749 (1970) (citations omitted).  In analyzing the voluntariness of a plea, the United States Supreme Court has explained that:

> the representations of the defendant, his lawyer, and the prosecutor as such a [plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in open court carry a strong presumption of verity.  The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

<u>Blackledge v. Allison</u>, 431 U.S. 63, 73-74 (1977); <u>see also</u> <u>United States v. Stewart</u>, 977 F.2d 81, 84 (3d Cir. 1992) ("The ritual of the [plea] colloquy is but a means toward determining

22

whether the plea was voluntary and knowing.  A transcript
showing full compliance with the customary inquiries and
admonitions furnishes, strong, although not necessarily
conclusive, evidence that the accused entered his plea without
coercion and with an appreciation of its consequences.").  "The
determination of whether a guilty plea was "voluntary" for the
purposes of the Constitution is a question of federal law, but
the determination of the facts surrounding the plea itself are
subject to AEDPA's highly deferential "clear and convincing"
standard."  See Bevins v. Wenerowicz, No. 11-2964, 2012 WL
3866895, at *4 (E.D. Pa. May 22, 2012), report and
recommendation adopted, 2012 WL 3871507 (E.D. Pa. Sept. 6, 2012)
(citing 28 U.S.C. § 2254(e)(1); Goggins v. Wilson, No. 07-1727,
2008 WL 343113, at *4 (E.D. Pa. Feb.5, 2008)).

The Superior Court meticulously and accurately reflected
what transpired during the plea colloquy in ultimately denying
Petitioner's motion to withdraw his guilty plea.  In his habeas
petition though, Petitioner states that he only accepted the
plea after counsel informed him that he could not represent him.
See ECF No. 1 at 26.  However, this is belied by Petitioner's
statement during the plea colloquy that nobody forced or
threatened him to plead guilty.  See ECF No. 5-4 at 3; see,
e.g., Stuart v. Phelps, No. 09-250, 2011 WL 1302929, at *4 (D.
Del. Apr. 1, 2011) ("[T]he statements Petitioner made during the

plea process belie his present allegations that counsel coerced him to plead guilty[.]"). Petitioner further admitted during the plea colloquy he discussed all his rights with his counsel and that understood them. See ECF No. 5-4 at 3-4.

Given this record, the Superior Court's ultimate conclusion that Petitioner's guilty plea was intelligent and voluntary was not an unreasonable application of clearly established federal law nor was the denial of Petitioner's motion to withdraw based on an unreasonable determination of the facts. Accordingly, Petitioner is not entitled to federal habeas relief on Claim II.

With respect to Claim I, Petitioner argues that he was denied the right to appeal because his appeal was placed on the Appellate Division's ESOA calendar. Petitioner was represented by counsel on appeal who argued that his thirty-year sentence was excessive. Additionally, Petitioner filed a pro se motion to have his appeal moved from the ESOA calendar to the plenary calendar because he also wanted to assert the Superior Court erred in denying his motion to withdraw his guilty plea.

Initially, this Court notes that there is not a constitutional right to hybrid representation. See United States v. D'Amario, 328 F. App'x 763, 764 (3d Cir. 2009) (citing McKaskle v. Wiggins, 465 U.S. 168, 183 (1984); see also United States v. Stenbrecher, 112 F. App'x 987, 988 (5th Cir. 2004) (noting no right to hybrid representation on appeal); Nelson v.

24

Lackner, No. 12-968 2013 WL 6178544, at *13 (E.D. Cal. Nov. 22, 2013) ("There is no federal constitutional right to self-representation on direct appeal, much less a right to hybrid representation that would require a court to permit a defendant to represent himself at the same time that he is represented by appellate counsel."). Thus, Petitioner did not have the constitutional right to file his own appellate brief as he did on direct appeal in this case. See Wallace v. Landry, No. 17-1790, 2019 WL 3860203, at *2 (M.D. La. Aug. 16, 2019) ("Because Petitioner was represented by counsel on appeal, Petitioner did not have a constitutional right to file his own appellate brief."). Accordingly, Petitioner's right to appeal was not prevented because he was represented by counsel on direct appeal who asserted his claims.

Petitioner's appellate counsel though may be deemed to have adopted Petitioner's pro se appellate motion by raising the issue during oral argument on appeal to the ESOA panel. See ECF No. 5-6 at 4-5. This request though was never decided by the Appellate Division. However, Petitioner appealed the failure of the Appellate Division to transfer his appeal to a plenary Appellate Division panel to the New Jersey Supreme Court in his petition for certification. See ECF No. 5-12. That court though denied Petitioner's petition for certification without discussion. See ECF No. 5-14. Thus, Petitioner was

permitted to and in fact did appeal the issue itself raised in Claim I.

Finally, and perhaps most importantly, the underlying issue that Petitioner wished to appeal was that the trial court erred in denying his motion to withdraw his guilty plea.  As described above, that denial was not contrary to or an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.  Thus, any purported impropriety by the Appellate Division in failing to reach Petitioner's claim regarding the denial of his motion to withdrawal was harmless as failing to reach this issue by the Appellate Division did not have a substantial or injurious effect on Petitioner's appeal to the Appellate Division.  <u>See</u> <u>e.g.</u>, <u>Eley v. Erickson</u>, 712 F.3d 837 (3d Cir.2013) (citing <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)).

Accordingly, Claims I and II are both denied.

B. <u>Claim III</u>

In Claim III, Petitioner argues trial counsel was ineffective due to a lack of diligence.  <u>See</u> ECF No. 1 at 28-29. More specifically, Petitioner notes several letters he sent to counsel which this Court interprets as Petitioner's complaints to counsel's performance for the reasons stated in the letters; more specifically:

26

1. Petitioner wrote trial counsel a letter postmarked November 9, 2012 requesting discovery materials and a probable cause hearing as well as inquiring into the status of his case and the reasoning behind the state's delays.

2. Petitioner wrote trial counsel on January 28, 2013 requesting that suppression motions be filed and that a Wade[3] hearing take place.

3. Petitioner requested an interlocutory appeal because he felt the Wade hearing decision was wrongly decided.

4. On January 14, 2014, Petitioner wrote to trial counsel requesting he get him a plea from 10-15 years imprisonment.

5. On January 27, 2014, Petitioner requested trial counsel file a motion to withdraw his guilty plea.

ECF No. 1 at 28-29.

Petitioner asserted these letters and the requests counsel failed to act on in those letters illustrate how counsel was ineffective in his PCR proceedings before the Superior Court. See ECF No. 5-18 at 9-12.  That court determined Petitioner failed to show that counsel was ineffective or that Petitioner was prejudiced under Strickland v. Washington, 466 U.S. 668 (1984).  See ECF 5-19 at 6-8.  On appeal, Petitioner argued the PCR Court erred in denying an evidentiary hearing.  Petitioner, through counsel, set forth his sole claim on appeal as follows:

> The [PCR] court denied defendant's
> allegations of ineffective assistance of
> counsels set forth in his petition for post-

---

[3] A Wade hearing is held to determine the admissibility of identification testimony.  See Manson v. Brathwaite, 432 U.S. 98, 114 (1977); United States v. Wade, 388 U.S. 218, 219-20 (1967) (vacating conviction pending a hearing to determine whether the in-court identifications had an independent source).

conviction relief, characterizing them as "bald assertions and lack[ing] merit." However, defendant alleged with specificity trial counsel's actions that he believed deprived him of effective assistance of counsel.  Defendant asserted that he had always intended to proceed to trial and counsel encouraged him throughout their year-long attorney-client relationship to do so.  But suddenly, on the day of opening statements, counsel changed his mind without offering defendant much of an explanation other than that he had overlooked some of the State's evidence and decided that defendant must negotiate a plea agreement. Defendant asserted that counsel also misadvised him that the court would impose a 15-year sentence on the open plea to aggravated manslaughter even though the exposure was greater.  Because these allegations established a prima facie case of ineffective assistance of counsel, the court's denial of defendant's post-conviction relief without even an evidentiary hearing to determine the effectiveness of counsel's representation was error.

ECF No. 5-22 at 21-22.  Petitioner did not include the letters outlined above that he attached to his PCR petition in the Superior Court to the Appellate Division on appeal.

Given these circumstances, Petitioner's arguments within Claim III may be considered unexhausted since they were not raised on appeal of the denial of Petitioner's PCR petition. Nevertheless, for the foregoing reasons, even applying a more lenient "colorable" standard rather than AEDPA's deferential standard, this Court will deny Claim III on the merits.

The Sixth Amendment guarantees effective assistance of counsel.  In _Strickland v. Washington_, 466 U.S. 668 (1984), the Supreme Court articulated the two-prong test for demonstrating when counsel is deemed ineffective.  First, the petitioner must show that considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. See _id._ at 688; _see also_ _Grant v. Lockett_, 709 F.3d 224, 232 (3d Cir. 2013) (noting that it is necessary to analyze an ineffectiveness claim considering all circumstances) (citation omitted).  A petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  See _Strickland_, 466 U.S. at 690.  Under this first prong of the _Strickland_ test, scrutiny of counsel's conduct must be "highly deferential."  See _id._ at 689.  Indeed, "[c]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  _Id._ at 690.

The reviewing court must make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  _Id._ at 689.  If counsel makes "a thorough investigation of law and facts" about his plausible options, the strategic choices he makes accordingly are "virtually unchallengeable."  _Gov't of_

Virgin Islands v. Weatherwax, 77 F.3d 1425, 1432 (3d Cir. 2006)
(citing Strickland, 466 U.S. at 690-91).  If, on the other hand,
counsel pursues a certain strategy after a less than complete
investigation, his choices are considered reasonable "to the
extent that reasonable professional judgments support the
limitations on investigation."  Rolan v. Vaughn, 445 F.3d 671,
682 (3d Cir. 2006) (citing Strickland, 466 U.S. at 690-91).

      The second prong of the Strickland test requires the
petitioner to affirmatively prove prejudice.  See 466 U.S at
693.  Prejudice is found where "there is a reasonable
probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different."  Id. at
694.  A reasonable probability is "a probability sufficient to
undermine confidence in the outcome."  Id.; see also McBridge v.
Superintendent, SCI Houtzdale, 687 F.3d 92, 102 n.11 (3d Cir.
2012).  "This does not require that counsel's actions more
likely than not altered the outcome, but the difference between
Strickland's prejudice standard and a more-probable-than-not
standard is slight and matters only in the rarest case.  The
likelihood of a different result must be substantial, not just
conceivable."  Harrington v. Richter, 562 U.S. 86, 111-12 (2011)
(internal quotation marks and citations omitted).

      "With respect to the sequence of the two prongs, the
Strickland Court held that 'a court need not determine whether

counsel's performance was deficient before examining the
prejudice suffered by the defendant as a result of the alleged
deficiencies.... If it is easier to dispose of an
ineffectiveness claim on the ground of lack of sufficient
prejudice ... that course should be followed.'" Rainey v.
Varner, 603 F.3d 189, 201 (3d Cir. 2010) (quoting Strickland,
466 U.S. at 697).

    With respect to Petitioner's November 9, 2012 requests,
including for discovery materials and a probable cause hearing,
Petitioner does not show with any specificity how counsel's
actions or inactions prejudiced him.  Any purported
ineffectiveness arising from this letter is bald and conclusory
which is insufficient to entitle Petitioner to federal habeas
relief.  Jesus-Concepcion v. United States, No. 17-12152 (MCA),
2019 WL 4127364, at *3 (D.N.J. Aug. 30, 2019) (citing Palmer v.
Hendricks, 592 F.3d 386, 395 (3d Cir. 2010)) ("[B]ald assertions
and conclusory allegations" are insufficient to establish an
ineffective assistance of counsel claim.).

    Next, given that a Wade hearing did take place, this Court
finds counsel was not ineffective for failing to respond to
Petitioner's January 28, 2013 letter requesting one.
Nevertheless, Petitioner also asserts counsel should have filed
an interlocutory appeal because the trial court's Wade hearing
decision was incorrect.  Thus, this Court will analyze whether

such an appeal would have been successful to a reasonable probability in analyzing this claim under Strickland's prejudice standard.

An out-of-court identification may implicate due-process concerns when "law enforcement officers use[d] an identification procedure that is both suggestive and unnecessary." Manson v. Brathwaite, 432 U.S. 98, 107 (1977); see also Neil v. Biggers, 409 U.S. 188, 198 (1972).  An identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create "a very substantial likelihood of irreparable misidentification."  Simmons v. United States, 390 U.S. 377, 384 (1968); see also Biggers, 409 U.S. at 197.  The United States Supreme Court has explained that, when the police use suggestive procedures, "the witness thereafter is apt to retain in his memory the image of the [misidentification] rather than that of the person actually seen, reducing the trustworthiness of subsequent lineup or courtroom identification."  Simmons, 390 U.S. at 383-84.

Nevertheless, it is insufficient to generally show that the identification "may have in some respects fallen short of the ideal."  Id. at 385.  Instead, "[i]t is the likelihood of misidentification which violates a defendant's right to due process."  Biggers, 409 U.S. at 198.  As the Supreme Court explained,

> An identification infected by improper
> police influence ... is not automatically
> excluded. Instead, the trial judge must
> screen the evidence for reliability
> pretrial. If there is a very substantial
> likelihood of irreparable misidentification,
> the judge must disallow presentation of the
> evidence at trial. But if the indicia of
> reliability are strong enough to outweigh
> the corrupting effect of the police-arranged
> suggestive circumstances, the identification
> evidence ordinarily will be admitted, and
> the jury will ultimately determine its
> worth.

Perry v. New Hampshire, 565 U.S. 228, 232 (2012) (internal

quotation marks and citation omitted).

The Supreme Court has thus held that, even if improper

procedures have rendered an identification unnecessarily

suggestive, the admission of the suggestive identification does

not violate due process so long as the identification possesses

sufficient aspects of reliability, as reliability is the

"linchpin in determining the admissibility of identification

testimony." Brathwaite, 432 U.S. at 106, 114; see also United

States v. Wise, 515 F.3d 207, 215 (3d Cir. 2008).  The central

question in determining whether an improper identification may

be admitted is "'whether under the totality of the circumstances

the identification was reliable even though the confrontation

procedure was suggestive.'" Brathwaite, 432 U.S. at 106

(quoting Biggers, 409 U.S. at 199); see also United States v.

Maloney, 513 F.3d 350, 355 (3d Cir. 2008).

In answering this question, a court should conduct a case-specific analysis, considering the following factors:  "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Biggers, 409 U.S. at 199-200; see also Simmons, 390 U.S. at 384. In Simmons v. United States, in which the Supreme Court addressed the constitutional infirmities arising from unduly suggestive photographic arrays, the Court held "that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification."  Simmons, 390 U.S. at 384.  This has been generally interpreted as a condemnation of "the use of photo arrays in which the suspect's photograph 'is in some way emphasized.'"  Darden v. Wainwright, 477 U.S. 168, 199 (1986) (quoting Simmons, 390 U.S. at 383).

To determine whether Petitioner has stated a "colorable" ineffective assistance of counsel claim, this Court will consider the propriety of the Superior Court's denial of Petitioner's suppression motion.  The Superior Court heard

testimony from Sergeant Mattioli, an investigating officer,
during the suppression hearing.  No other witnesses were called
by either side.  This officer testified that Rice was able to
identify the individual (Petitioner) at the crime scene
immediately after the shooting because he recognized him as his
neighbor.  See ECF No. 5-3 at 14-17.  Mattioli testified that a
photo array was not needed with Rice because he already knew
him.  See id. at 19.

Similarly, Mattioli testified that Stanford was familiar
with the person (Petitioner) she saw outside after the shooting
occurred as he was one of her neighbors and that she also
recognized his truck.  See id. at 27-28.  Like Rice, a photo
array was not used to have Stanford identify Petitioner because
she said she knew the person she saw.  See id. at 28.

The trial court denied the suppression motion by Petitioner
in a lengthy decision from the bench.  More specifically, the
trial judge stated as follows:

> Mattioli has been here today and he – and
> he's testified. I found him to be credible .
> . . .  I found him to be credible and
> somebody that's been doing this for a number
> of years . . . . I'm looking at the date,
> 1/13/12, when the two interviews were
> conducted of Rice and Stanford, so that was
> about, you know, 13, almost three weeks
> after the – after the shootings.  And that
> indicated he had discussions with them off
> tape to get a feel for their amenability to
> give a statement and to ask them what they
> saw, what they knew, etc., before the tape

would go on.  He indicated that – Mr. Rice
indicated that he was not initially totally
candid on the date of the incident because
he was somewhat reluctant.  When the tape
went on the interview, he was then asked to
confirm things that were discussed off of
the tape.  He indicated that he talked to
Rice for about an hour before he put the
tape on and that he basically went over what
Rice saw, what he heard, what he did and
what he said on the night of the offence.

Rice gave a description that was of Mr.
Ross.  He indicated that initially his
reaction was drawn to the area when he heard
a gunshot and a crash.  He looked out the
window and he recognized who he said was Mr.
Ross, saw him near the truck.  He said that
Mr. Ross was his neighbor, lived in the same
complex a short distance away and he knew
him.

And that was the key thing that Mattioli
relied upon, is that I wasn't talking about
somebody or I had to show him a six-pack of
photographs because he knew this person,
because he lived near him and he has seen
him.  Even though he didn't know his name,
he knows him from being a neighbor and he
indicated he saw him more than 20 times
previously.  And that was the reason he
indicated there was no photo array.
He also indicated that he saw a female go to
the crash area and look around and he also
knew her and he identified her as Tenika
(sic) Williams.  He indicated that he knew
her and he was shown the photo and then he
positively ID'd her.

Rice indicated again on tape everything I
indicated.  He knew the two people that were
identified; they were neighbors.  He then
ID'd them from the one photo that was shown.
He knew about them, but didn't know their
name. . . .

And then so basically what Mattioli said was
that he did not follow the Attorney General
Guidelines, nor did he show them a six-pack
or anything like a lineup or anything like
that because these people articulated to him
that they knew who these people were,
although not by name, but by sight form
living in the area and seeing them on a
regular ongoing basis.  They indicated they
saw the defendant go up to that truck many
times before.  He said he was hundred
percent sure that it was him, Rice said,
'cause he had seen him more than 20 times.

In the case of – in the case of Miss
Stanford, when she identified Miss Williams,
she indicated that while she didn't see her
face, that she knew her from build.  And she
also indicated, which I think is of
paramount importance, she said she went to
school with her.  So you go to school with
somebody, you see them, you know, more than
once or twice and, you know, you know who
they are, what they look like.  So that was
– that to me was actually the most
compelling part of the statement.  It really
wasn't emphasized, but to me it was the most
compelling part where she said she went to
school with her.

She said that she did not see the faces of
either of the defendants, but that she knew
that the male, Mr. Ross, from the hoodie
that he always wore when he sat out on the
port, it was the same hoodie, and he knew –
and that they – she knew her, Miss Williams,
from her build and from her being with the
defendant, who were allegedly a couple.

Cross-examination took place about the
Attorney General Guidelines and the – and
the like.  Under the Henderson case, quite
frankly, I probably could've stopped the
hearing at some point 'cause under that
case, it indicates that if you grant a
hearing, that if and when the point comes
that the Court is satisfied that the

identification procedure was not
impermissibly suggestive, that the judge
could stop the hearing midstream.  I chose
not to do that for purposes of completeness
of the record and the like and I let the
hearing go on.

But, quite frankly, the main issue was what
happened off tape and whether or not
anything happened off tape or whether it was
suggested in any way, shape or form that
these were the people who were identified
that were involved in the incident.

Under Henderson, we now have the Supreme
Court case, heh, decided and the opinion
written by Chief Justice Rabner that, quite
frankly, makes these identification matters
much more complete and provides many more
variables that could be addressed,
especially by defense counsel, in
determining whether or not the overall
identification, A, is reliable under a
totality of circumstances and, B, whether
the identification in and of itself was a
result of impermissibly suggestive
procedures that would make the
identification be suspect.

First to obtain a pretrial hearing,
defendant has to show the initial burden of
evidence of suggestiveness.  As I said, I
really couldn't say when I ordered the
hearing because I didn't know what happened
off cam – off.  So I chose to error (sic) on
the side of caution and say we have to have
a hearing 'cause I don't know if there was
an issue of suggestiveness because I don't
know what happened.  I ordered the hearing.

Second, the State then has to come forward
with proof under Henderson to show that the
proper eyewitness identification is
reliable.  That's what this is all about,
reliability.  And you must account for
system and estimator variables.  It goes
without saying that the estimator variables

come into play much more importantly and
more prevalent at the time of any trial when
the people who made the identification are
present in court.

But as far as the system variables, how it
was done, how it was conducted, where it was
conducted, the circumstances under which it
was conducted, was there a lineup, was there
a show-up, was there a six-pack, they –
they're all the system variables and they
had to be analyzed to show whether or not
there was an issue of suggestiveness.

And third, the bottom line is, is that after
you go through these exercises, the burden
is still on the defendant to show not that
there may have been irreparable
mi[s]identification, but under the law, the
case law, a very substantial likelihood of
irreparable misidentification.  It's a
pretty high burden if you look at the
literal meaning of those words.  You know,
not, oh, well, maybe there was a
mi[s]identification.  That's not the
standard.  The standard is whether or not
there was a very substantial likelihood of
irreparable mi[s]identification.

And then finally the fourth analysis or the
fourth prong is that after hearing all of
the evidence and weighing all of the
evidence, the Court must decide from a
totality of the circumstances whether or not
the defendant has carried their burden to
show a very substantial likelihood of
mi[s]identification.  If so, the Court
should suppress the identification.  If not,
then appropriate tailored jury instructions
should be prepared and given to the trier-
of-fact.

On these system variables, there's things
that have to be considered, such as blind
administration, was a lineup procedure
performed double-blind, etc.  Was there an
envelope method, preidentification

instructions.  Whether or not the
administrator provided neutral
preidentification instructions or warning
the suspect may not be present and should
not feel compelled to make an
identification.  That was not done in this
case, admittedly so.  But whether or not
that is fatal, I will go into.

If there was a lineup construction, which
there was not here, whether the array only
had one suspect or five innocent fillers,
which did not occur here, either.  There was
one picture shown.  Feedback, whether the
witness received any information or feedback
about the suspect.  Recording confidence,
whether or not the witness's statement of
confidence immediately after the
identification.  In this case, the male
indicated he was hundred precent certain of
the identification.  Multiple viewing, show-
ups, private actors and other
identifications that were made.  Those are
all the things that would go into the system
variables.

As far as the estimator variables, stress,
weapon, focus, duration, how much time did
the witness have to observe, distance and
lighting, whether that was a distraction.
Witness characteristics, whether the witness
was under the influence of drugs, things of
that nature.  Characteristics of the
perpetrator, was he wearing a disguise.  In
this case, a great mention was made of the
fact that the defendant Ross was wearing a
hoodie that he always wore and that he was –
and that the person who did the
identification was familiar with while Ross
sat on his porch during winter cold nights.
So that was a – obviously a characteristic
of the perpetrator.

Memory decay, race bias, opportunity to view
at the time of the crime, degree of
attention, accuracy of prior description,
level of certainty demonstrated and the time

lapse between the crime and the confrontation.  All of those things go into the equation.

Quite frankly, this is a little bit of a unique situation in that the off-cam – off-tape discussions that took place were not really very long in conjunction with what happened and what was seen.  And it was be – and it wasn't, you know, where they were trying to pull a needle from a haystack where there was no familiarity with the person being identified, where, you know, somebody says, yeah, I saw this occur, it happened bim-boom-boom, you know, I never saw – got a good look at the person, I never saw the person before.

You know, here you have what is tantamount to somebody coming into court here, or anybody, it could be anybody, and saying, here, I looked outside and I heard a shot and I saw my neighbor, who I see every day, and he had the same clothing on that he wears every day, you know, when it's cold and I saw him, you know, next to this car and a guy in it was shot.  And then I saw the girl that's always with him and I see them every day and I saw her on her hands and knees looking for something and then the – heard a police car and they took off and they went and that, you know, and that I know it was them.  I'm a hundred precent sure because I know them, I see them, they're my neighbors.  So it's a unique situation.

But it adds to the identification and it adds to the factors to be considered under the system of variables of whether or not the identification is reliable and whether or not the – it is – whether or not there's a likelihood that the identification could be fraud.

Therefore, under the totality of the circumstances, it would seem that the, as I

said, the witnesses knew the suspects, were
familiar with the truck in question, were
familiar with them and lived next to them,
have seen them on numerous occasions and in
the – and in the event of the female,
Stafford (sic) said she went to school with
Miss Williams.  You can't get much more than
that.

Familiar with the clothing worn by Mr. Ross.
Observed them from immediately after the
incident occurred.  Within seconds, looked
out and saw them at the "crime scene."  No,
they did not see somebody pull the gun.
They did not see who had a gun in their
hand.  They did not see the shot fired.  But
within seconds, they looked outside and came
upon and looked, and looked at what was a
"crime scene" where there were people still
on the scene.

No question it was dark out.  It appears
that – even though it didn't – wasn't gone
into very much, the testimony – it would
appear that the angle and distance of the
view from the window of the apartment to the
street was one without major hinderance or
obstruction.

Again, the male suspect was wearing this
hoodie attributable to him.  And they – the
identifications were made about three weeks
after the shooting.  And in the grand scheme
of things when you look at identifications
that take place, that's not a long period of
time as far as for memories to fade or to
forget things.  Most identification
procedures are after months and months of
police investigation.  So I find that those
three weeks is of no real – really of no
moment to the overall analysis.

The Court went on to say in Henderson that
the A.G. Guidelines provided practices for
photo lineups and whether a minimum number
of five filler or non-suspects should be
shown to the witness at one time.  And the

Henderson case made reference to failure to
comply with those guidelines and said that
the Attorney General noted that the
identifications that do not follow the
recommended guidelines should not be deemed
inadmissible or otherwise in error.

Although the State argued that the Court
should defer to other branches of government
to deal with the evolving social or
scientific landscape, it's the Court's
obligation to guarantee that Constitutional
requirements are met and to ensure the
integrity of criminal trials.  The Court
went on to say that that would not be fatal
and that obviously you have to look at a
totality of the circumstances of the --- of
the identification.

The goal is reliability, obviously.  And the
goal is to show that there's no
misidentification.  And, quite frankly,
there's probably very, very few
identifications that could possibly take
place would appear to be on their face more
reliable than somebody identifying their
next-door neighbor, identifying somebody
that they live next to and see on numerous,
numerous occasions.

And for those reason [sic] and all the
reasons previously articulated, the
defendant in my view does not come close to
establishing an irreparable miscon –
misidentification to show that in any way,
shape or form that the -- that there was a
substantial likelihood of it.  I think that,
you know, the circumstances of the
identification and the particulars of it
will be brought out at the time of any trial
in this case, but the defense has fallen
short of proving that.  And, therefore, the
motion to suppress the statements would be
denied.

ECF No. 5-3 at 117-29.

In this case, as outlined above, the trial court screened the identifications for their reliability pre-trial.  The trial court determined both identifications possessed sufficient aspects of reliability.  That court analyzed the identifications applying the totality of the circumstances and properly held that there was no substantial likelihood of irreparable misidentification.  This Court finds no reason to disturb those findings.  Accordingly, Petitioner fails to show that counsel was ineffective by not filing an interlocutory appeal on a meritless issue and also fails to show that he was prejudiced by counsel not filing an appeal as he does not show to a reasonable probability that the outcome of his appeal would have been successful.  See Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000) ("[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim.") (citation omitted); United States v. Jackson, No. 09-5255, 2010 WL 1688543, at *8 (E.D. Pa. Apr. 27, 2010) (citing United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999)) ("Under Strickland, Jackson's appellate counsel cannot be ineffective for failing to raise a meritless issue on appeal.").

Next, Petitioner alludes to a January 20, 2014 letter – sent to counsel after his guilty plea, but before sentencing, in which he requested counsel get him a plea "within the range of 10 to 15 years."  See ECF No. 1 at 29.  During the plea

colloquy, Petitioner testified that he understood with his open plea that he faced between ten to thirty years imprisonment. That Petitioner was ultimately sentenced to the high end of that range and that counsel was not able to secure a sentence that Petitioner would have preferred does not amount to ineffectiveness on the part of trial counsel.

Finally, Petitioner is not entitled to federal habeas relief related to his January 27, 2014 letter to counsel requesting he file a motion to withdraw his guilty plea. Indeed, counsel in fact filed a request to withdraw Petitioner's guilty plea.  Thus, counsel was not ineffective as he followed Petitioner's wishes in filing the motion.

Accordingly, Petitioner is not entitled to habeas relief on any of his arguments within Claim III.

C. Claim IV

Petitioner asserts in Claim IV that trial counsel failed to investigate and present a trial strategy which compelled Petitioner to plead guilty.  More specifically, Petitioner takes exception to the credibility of Rice and Stanford's statements and identifications to police.  Petitioner claims the fact their identifications were made three weeks after the crimes and that Petitioner was not even charged until six months after their identifications establishes the questionability of their identifications.

Petitioner fails to show that he is entitled to federal habeas relief on this claim.  Indeed, the reliability and credibility of the two witnesses was correctly analyzed in depth during the pretrial suppression hearing.  Claim IV will therefore be denied.

D. Claim V

In Claim V, Petitioner claims counsel was ineffective because he failed to obtain an affidavit from Rice that would have supported Petitioner's actual innocence argument at his plea withdrawal hearing.

This Court construes this claim as one of trial counsel's purported failure to investigate.  More specifically, trial counsel purportedly failed to investigate and get an affidavit from Rice to support Petitioner's actual innocence theory at his plea withdrawal hearing.

In Duncan v. Morton, 256 F.3d 189, 202 (3d Cir. 2001), the Third Circuit found that a habeas petitioner's failure to present sworn testimony by the witnesses the habeas petitioner claimed counsel should have investigated and called as a witness amounted to a failure to establish Strickland prejudice.  See id. ("In light of Duncan's failure to present any sworn testimony *by Sherman*, he has failed to establish prejudice as a result of [counsel's] failure to interview Sherman.") (emphasis added).  Here, Petitioner fails to provide a sworn statement

from Rice regarding what his testimony would have been had counsel asked him for an affidavit or had him testify at Petitioner's plea withdrawal hearing.

It is worth noting though that in his PCR proceedings, Petitioner submitted a notarized statement from Rice dated October 25, 2013, in which Rice stated as follows:

> I told a lie about witnessing Lenny Ross Jr. shooting a man in Pleasantville N.J.  I was scared that the Detective's were going to arrest me on my outstanding warrants and I just said whatever to keep them from arresting me and putting me in jail.  I was under the influence of drugs and alcohol at the time.  I'm writing this on my own free will.

ECF No. 5-18 at 82.  First, Rice's statement did not comply with New Jersey's rules for affidavits because it was not a sworn statement or certified in lieu of an oath.  See N.J. Ct. R. 1:4-4 ("In lieu of the affidavit, oath or verification required by these rules, the affiant may submit the following certification which shall be dated and immediately precede the affiant's signature: "I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.").

Second, as noted in Duncan, to obtain federal habeas relief on a failure to investigate claim, Petitioner needed to come forward with an affidavit from Rice, something he still has failed to do in these federal habeas proceedings.  Accordingly,

Petitioner fails to show to a reasonable probability that the outcome of his proceedings would have been different had trial counsel made further investigation as it relates to a possible Rice affidavit.

Within Claim V, Petitioner also claims trial counsel was ineffective because he failed to submit an affidavit from Petitioner to support his actual innocence claim to support his withdrawal of guilty plea request.  However, Petitioner fails to show to a reasonable probability that the outcome would have been different had he provided an affidavit from himself at his plea withdrawal hearing to support an actual innocence argument. The underlying case against Petitioner included two eyewitnesses which placed Petitioner at the crime scene immediately after it occurred.  The case against him was strong and this Court fails to see how a self-serving affidavit from Petitioner during his plea withdraw hearing would have changed the result to a reasonable probability.  Thus, Petitioner is not entitled to federal habeas relief on either of his arguments within Claim V.

E. Claim VI

Petitioner makes three ineffective assistance of counsel arguments within Claim VI.  Each are considered in turn.

First, Petitioner claims that appellate counsel was ineffective by failing to argue Petitioner's motion that his appeal be removed from the ESOA calendar and assigned to the

plenary calendar.  Contrary to Petitioner's claim, as detailed supra, counsel did request on appeal during oral argument per Petitioner's wishes that the matter be removed from the ESOA calendar to the plenary calendar.  Thus, counsel cannot be deemed ineffective based on this argument as he did what Petitioner asked him to do.

Next, Plaintiff asserts counsel was ineffective on appeal because counsel did not appeal the denial of Petitioner's motion to withdrawal his guilty plea.  Petitioner though fails to show any prejudice under Strickland with respect to this argument. Indeed, as described supra, Petitioner failed to show that he was entitled to withdrawal his guilty plea.

Finally, Petitioner asserts counsel was ineffective on appeal because counsel did not appeal the denial of his pretrial suppression motion.  As described supra, the trial court properly denied Petitioner's motion to suppress Rice and Stanford's identifications.  Thus, Petitioner's counsel was not ineffective on appeal for not raising a meritless issue.  See Werts, 228 F.3d at 203.  Therefore, Petitioner is not entitled to federal habeas relief on any of his arguments within Claim VI.

F. Claim VII

In Claim VII, Petitioner asserts that PCR counsel was ineffective for failing to interview Rice, Aaron Chandler and

Petitioner's trial counsel.  Petitioner is not entitled to federal habeas relief on this claim.  Indeed, 28 U.S.C. § 2254(i) precludes claims for ineffective assistance of PCR counsel.  See, e.g., Martinez v. Ryan, 566 U.S. 1, 18 (2012) (while ineffective assistance on initial collateral review proceedings may be grounds for excusing procedural default, it is not the basis for an independent constitutional claim).  Accordingly, Claim VII is denied.

V.   CERTIFICATE OF APPEALABILTY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254.  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).  Petitioner is not entitled to a certificate of appealability on any of his claims applying this standard.

VI.  CONCLUSION

For the foregoing reasons, Petitioner's habeas petition will be denied and a certificate of appealability shall not issue.  An appropriate order will be entered.


Dated: June 2, 2022                     s/   Noel L. Hillman
At Camden, New Jersey                   NOEL L. HILLMAN, U.S.D.J.